IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JOSEPH WILBORN,                          )
                                         )
                  Plaintiff,             )
                                         )
vs.                                      )    Case No.   13-cv-176-SCW
                                         )
LOUIS SCHICKER, MARVIN POWERS,           )
and NIGEL VINYARD,                       )
                                         )
                  Defendants.            )

MEMORANDUM AND ORDER

WILLIAMS, Magistrate Judge:

INTRODUCTION

This matter is before the Court in a motion for summary judgment filed by
Defendants Shicker and Vinyard (Docs. 141 and 142) and a motion for summary
judgment filed by Defendant Powers (Doc. 143).   Plaintiff has filed responses to both
motions respectively (Docs. 147 and 151).   The Court heard oral arguments on February
12, 2016 and made a ruling on Defendants' motions on the record.   The following
memorializes the Court's findings at that hearing.   The Court **DENIES** Defendant
Powers' motion for summary judgment and **GRANTS IN PART AND DENIES IN
PART** the summary judgment motion filed by Defendants Shicker and Vinyard.

FACTUAL BACKGROUND

Prior to Plaintiff's transfer to Tamms Supermax Correctional Center, Plaintiff had
a history of dislocated shoulders (Doc. 143-1, p. 1 ¶4, p. 35).   On April 2, 2011 Plaintiff

received a dislocated shoulder and when he arrived at Pontiac on April 3, 2011, he was transferred to St. James Hospital ER to have his shoulder set and x-rays (*Id*. at p. 2 ¶ 6, p. 36-42).   X-rays were taken and a reduction of the dislocation occurred while at St. James Hospital (*Id*. at p. 2 ¶ 7, p. 40, 43-45).   Plaintiff was then transferred back to Pontiac.

While at Menard, Plaintiff reported that his shoulder was sore on July 28, 2011 (Doc. 143-1, p. 2 ¶ 9, p. 49).   The medical records note that Plaintiff had an average range of motion in the right arm and no distress (*Id*.).   Plaintiff disputes that he had an average range of motion as he was in handcuffs at the time that the nurse examined him (Doc. 151-1, p. 15).

Plaintiff was transferred to Tamms on July 28, 2011 (Doc. 143-1, p. 2 ¶ 10, p. 50). At the time of intake, Plaintiff reported right shoulder discomfort (*Id*.).   Plaintiff was observed to have bruising, abrasions, and lacerations to his face and torso and his right shoulder appeared to be dislocated (*Id*.).   At 11:05 p.m. Plaintiff was given Tylenol and put on the next MD line.   Heartland Regional Medical Center ER was notified that Plaintiff would be transferred for radiology/x-rays (*Id*. p. 51-53).   The records do not indicate that Dr. Powers was contacted.

Powers examined Plaintiff's shoulder on July 29, 2011 at 8:30 a.m. (Doc. 143-1, p. 2 ¶ 12, p. 53-54).   The medical records note that his right shoulder and right arm were drooping.   The records also noted a history of dislocating and reducing spontaneously (*Id*.).   Plaintiff was transferred to Heartland Regional Medical Center at 9:15 a.m. (Doc. 143-1, p. 54-56).   At Heartland Regional Medical Center, Plaintiff's pain was labeled a 10

out of 10 and that the pain started within the last 24 hours (Doc. 143-1, p. 3 ¶ 13, p. 59; 143-2, p. 1).   Heartland Regional Medical Center completed a shoulder reduction at 1:01 p.m. and reassessed at 1:37 p.m. with x-rays (Doc. 143-1, p. 3 ¶ 14; 143-2, p. 1-3).   The x-ray report indicated that after the reduction, the alignment was normal, with no evidence of fracture or dislocation, and that the reduction was successful (Doc. 143-2, p. 11).   There was also a note of dense calcification in the right arm, suggestive of myositis ossificans (*Id*. at p. 7).   Plaintiff was re-examined at 3:44 p.m. and noted no pain and was able to move all four extremities with equal strength and no numbness or tingling (Doc. 143-1, p. 3 ¶ 14; 143-2, p. 1).   Plaintiff was discharged at 3:48 p.m. with instructions to follow up with his "family doctor" (Doc. 143-2, p. 2-13).   The record also noted that Plaintiff would probably need a referral to an orthopedist for care for his shoulder (*Id*. at p. 13).   Dr. Jaffe testified that he included the referral because Plaintiff informed him his shoulder had been dislocated four prior times and that patients with shoulder dislocations usually need specialty care (Doc. 142-4, p. 32).   Jaffe testified that without further care, Plaintiff could have chronic shoulder instability which could cause dislocations in the future (*Id*. at p. 35).

Upon return to Tamms, Plaintiff was placed in the infirmary for monitoring (Doc. 143-1, p. 3 ¶ 16; 143-2, p. 21-63).   Powers saw Plaintiff eight times between July 29 and August 23.   During the time in the infirmary, Plaintiff took Tylenol regularly and had no severe shoulder pain, although Plaintiff indicates that he complained of pain and requested medication on fifteen dates (Doc. 143-2, p. 21-63).   It was reported that he

slept and ate well.   The records note that Plaintiff was observed not wearing his sling on numerous occasions although Plaintiff contests that he was not using his sling as directed (Doc. 143-2, p. 29, 30, 41, 49, and 54).   Plaintiff indicates that he removed his sling only to perform activities of daily life which was allowed (Doc. 143-1, p. 22).

On October 6, 2011, Plaintiff complained of right shoulder pain and that nothing helped the pain (Doc. 143-1, p. 3 ¶ 17; 143-2, p. 68).   Plaintiff was ordered to use cold and warm moist packs (*Id.*).   Plaintiff again reported on October 13, 2011 that his shoulder hurt all of the time and that he thought he tore something in the shoulder (Doc. 143-1, p. 4 ¶18; 143-2, p. 69).   Powers met with Plaintiff on October 17, 2011 and tested his range of motion, finding that Plaintiff could elevate the arm but had limited range of motion when attempting to revolve scapula (Doc. 143-1, p. 44 ¶ 19; 143-2, p. 70). Plaintiff was advised to continue with range of motion exercises (*Id.*).

On December 3, 2011, Plaintiff reported that his right shoulder continued to hurt and that Tylenol and Motrin did not help (Doc. 143-1, p. 4 ¶ 20; 143-2, p. 72).   He indicated that he had "knots" in his breast bone and wanted to be seen by Powers (*Id.*). Powers saw Plaintiff on December 6, 2011 for his right shoulder pain (Doc. 143-1, p. 4 ¶ 21; 143-2, p. 73).   Powers noted that the x-rays of his shoulder showed that the dislocation had been reduced and his shoulder appeared fine (*Id.*).   Plaintiff again complained that his shoulder hurt on December 20, 2011 (Doc. 143-1, p. 4 ¶22; 143-2, p. 74).   Plaintiff was ordered Naproxen for two weeks and his range of motion was noted as good.   Security reported that he was going to the yard and exercising (*Id.*).   Plaintiff

saw Powers again on December 21, 2011 and there was no tenderness noted in his shoulder (Doc. 143-1, p. 4 ¶ 23; 143-1, p. 1).   Powers noted no deformity.

On January 12, 2012, security responded to Plaintiff's cell because he was covering the door with a blanket (Doc. 143-1, p. 4 ¶ 24; 143-3, p. 2).   A tactical team was activated and Plaintiff was removed from the cell.   After the removal, he was sent to the treatment room for right shoulder discomfort.   No redness, bruising, or deformity was noted (Doc. 143-3, p. 2).   Plaintiff complained to medical on January 21, 2012 that his right shoulder still hurt and that pain medication was not working (Doc. 143-3, p. 3-4).

On January 30, 2012, Plaintiff reported that his pain in his shoulder was constant and there was throbbing (Doc. 143-1, p. 4-5 ¶ 25; 143-3, p. 6).   The medical records note that Plaintiff grimaced when his range of motion was checked and there was slight swelling (*Id*.).   Plaintiff saw Powers on February 2, 2012 and Powers noted that he had good grip strength and no muscle atrophy (Doc. 143-1, p. 5 ¶ 26; 143-3, p. 7).   He was prescribed Naprosyn twice a day for two weeks (Doc. 143-3, p. 7).   He informed the nurse on February 24, 2012 that he needed to see a doctor because his shoulder was not getting better (Doc. 143-1, p. 5 ¶ 27; 143-3, p. 8).   He did not grimace when he raised his arms over his head (*Id*.).   He complained that the Naprosyn did not help but hurt his stomach.   Plaintiff again complained of shoulder pain on February 28, 2012 and was advised to continue with his exercises (Doc. 143-1, p. 5 ¶ 28; 143-3, p. 9).

Plaintiff complained to a nurse on April 12, 2012 that he hurt his right shoulder during an altercation with tactical team on April 7, 2012 (Doc. 143-1, p. 5 ¶ 29; 143-3, p.

12, 10).   No swelling or bruising was noted.   His shoulder appeared tender on examination (*Id.*).   Plaintiff saw Powers on April 17, 2012 for shoulder pain (Doc. 143-1, p. 5 ¶ 30; 143-3, p. 13).   His shoulder appeared normal with no tenderness.   He was prescribed Acetaminophen.

Plaintiff was seen at his cell on May 20, 2012 and asked for Tylenol (Doc. 143-1, p. 5 ¶ 31; 143-3, p. 14).   On June 18, 2012 Plaintiff complained of right shoulder pain from a July 2011 injury (Doc. 143-1, p. 5-6 ¶ 32; 143-3, p. 15).   The medical records noted no swelling and that his range of motion was within normal limits and had a normal appearance (*Id.*).   Powers saw Plaintiff on June 20, 2012 for shoulder pain and it was noted that his shoulder had been dislocated several times (Doc. 143-1, p. 6 ¶ 33; 143-3, p. 16).   Plaintiff had good range of motion, no atrophy, no upper muscle tension and no tenderness (*Id.*).   He was prescribed Acetaminophen for seven days.

On October 29, 2012 Plaintiff was extracted from his cell by tactical team (Doc. 143-1, p. 6 ¶ 34; 143-3, p. 20).   Although his shoulder was examined after the incident, it was examined through his clothing because Plaintiff was restrained (Doc. 143-3, p. 20-21).   No swelling, deformities, or defects were noted (*Id.*).   Plaintiff was again extracted from his cell by the tactical team on November 2, 2012 (Doc. 143-3, p. 6 ¶ 35; 143-3, p. 30-31).   He stated that his head and right shoulder were hurting but no deformity or swelling was noted (Doc. 143-3, p. 30-31).   Plaintiff was given a shower and then his shoulder was re-evaluated and no swelling or bruising was noted (Doc. 143-3, p. 31).   Plaintiff was in another altercation with security on November 4, 2012

but he did not complaint about any injuries to his shoulder at that time (Doc. 143-3, p. 39).

Plaintiff complained to medical on November 21, 2012 of various ailments including right shoulder pain (Doc. 143-1, p. 7; 143-3, p. 51).   No major pathology was noted and he was prescribed Motrin (*Id.*).   Plaintiff was again brought for treatment on December 1, 2012 after another cell extraction by the tactical team (Doc. 143-1, p. 7 ¶ 38; 143-3, p. 52).   Plaintiff was assessed for injuries and other than a small nick on the forehead no other injuries were noted (Doc. 143-3, p. 52-53).   Plaintiff was transferred from Tamms in December 2012 and Dr. Powers did not see him after the transfer.

Plaintiff's medical records from St. James in April 2011 indicate a possible Hills Sachs deformity.   Powers does not recall if he was aware of those records at the time he treated Plaintiff in July 2011 (Doc. 143-4, p. 10-11).   At the time of his deposition Powers did not know what a Hills-Sachs deformity was (Doc. 143-4, p. 11).   A Hills-Sachs deformity is an impaction fracture (Doc. 143-6, p. 7).   It can lead to subsequent dislocations if not fixed and based on the size of the deformity may require surgery (Id. at p. 7-8).   Dr. Newcomer testified that Plaintiff's deformity appeared large, although he could not confirm without a CT scan or MRI, and that it was a size which he would "strongly consider surgical correction" (*Id.* at p. 8).   The size of the deformity, according to Newcomer, rendered Plaintiff's shoulder "grossly unstable" and was "an easy, clear referral to an orthopedic specialist" (*Id.* at p. 13).

Plaintiff's expert, Dr. Newcomer, did not offer evidence that Powers deviated

from the standard of care (Doc. 143-6, p. 5).   Instead, Newcomer testified that Plaintiff should have been sent to an orthopedic surgeon in July 2011 (*Id*.).   Newcomer found that Powers appropriately transferred Plaintiff to the emergency room once he arrived at Tamms Correctional Center (*Id*. at p. 5).   However, where the ER doctor wrote that Plaintiff should "probably" be referred to an orthopedic surgeon, Newcomer testified that Plaintiff definitely should have been referred (*Id*. at p. 5-6).   Powers chose not to send Plaintiff to an orthopedic surgeon, which Newcomer testified from Powers' affidavit was because of Power's financial considerations and the consideration that he believed Plaintiff was dangerous (*Id*. at p. 6).   Powers testified that Plaintiff suffered from prior dislocations all stemming from altercations he had with others and that it would have been easier for Plaintiff to modify his behavior rather than get into altercations causing dislocations of his shoulder (Doc. 143-4, p. 15).   Powers testified that he did not send Plaintiff to an orthopedist in part due to Plaintiff's behavior and because the radiologist report said there was normal alignment and normal soft tissue with no fractures (*Id*.).   Powers also had a general safety concern of transporting Plaintiff out for care (*Id*.).   Newcomer testified that he believed that Powers had an ethical obligation to send Powers to a specialist and that Powers "fell below ethical standards" (Doc. 143-6, p. 14).

Newcomer testified that the x-rays he received at the ER clearly showed a Hill-Sachs deformity (Doc. 143-6 at p. 7).   The radiologist report, itself, does not indicate such a deformity and Newcomer indicated that he would not expect Powers, as a

general practitioner to be able to detect the deformity on the x-ray (*Id.*).   Newcomer also testified that given Plaintiff's injury, Plaintiff would require narcotics for the pain, especially at night (Doc. 143-6, p. 9).   Newcomer has never treated a dislocated shoulder with Tylenol or Ibuprofen (*Id.* at p. 10).   His experience has been that those drugs are not strong enough for the pain of that sort of injury (*Id.* at p. 11).

As to Defendant Shicker, he is the medical director for IDOC (Doc. 142-1, p. 3). He is board certified in internal medicine but does not treat inmates (*Id.* at p. 3). Plaintiff wrote a letter to Shicker on June 18, 2012 requesting that he be allowed to see an orthopedic doctor (Doc. 142-1, p. 6; 142-2, p. 1).   Plaintiff testified that he sent several letters to Shicker and he wrote a grievance on February 15, 2012 against Shicker (Doc. 147-2, p. 33-34; 147-3).   Shicker testified that he receives approximately five letters a week from inmates regarding medical issues and that he reads the letters and then contacts the facility's healthcare unit about the inmate's condition (Doc. 142-1, p. 7). Depending on the nature of the complaint, or if the letter raises any red flags, he might review the medical records himself or have the coordinator review the records and report to him (*Id.*).

In Plaintiff's case, Shicker contacted Nigel Vinyard by email on July 13, 2012 (Doc. 142-1, p. 8; 142-2, p.2).   The email was also addressed to Powers, Lisa Prather, the Tamms nursing coordinator, and Dr. Matticks, Wexford's regional director    (Doc. 142-2, p. 2).   After receiving a response from Vinyard about Plaintiff's treatment, Shicker relied on the response to respond to Plaintiff (Doc. 142-1, p. 8; 142-2, p. 2).

Shicker saw from the email that Plaintiff had dislocated his shoulder and was seen by an emergency room doctor to fix the dislocation, and that Plaintiff had been evaluated numerous times for complaints of pain and was being treated with pain medication by Dr. Powers (Doc. 142-2, p. 2; 142-1, p. 8-9).   Shicker did not personally review the entire medical file because he believed Vinyard's email to be an accurate assessment and there were no "red flags" in his mind regarding Plaintiff's treatment, based on the email (Doc. 142-1, p. 11).   Shicker responded to Plaintiff's letter indicating that Plaintiff's shoulder had been stabilized and he was receiving appropriate care by the doctor and nurses (Doc. 142-3, p. 3).

Defendant Vinyard, at the time of the allegations in Plaintiff's complaint, was the administrator in charge of the healthcare unit at Tamms (Doc. 142-1, p. 5).   While Vinyard testified that she never examined Plaintiff, Wilborn testified that she at the very least was present one time when Powers examined Plaintiff (Doc. 142-3, p.99-100; 147-1). Plaintiff has also offered evidence that Vinyard reviewed numerous grievances written by Wilborn about his right shoulder pain and that he was not getting proper medical treatment (Doc. 148-3).   Vinyard had no authority to refer an inmate to a specialist or override Power's medical decisions, although, according to Powers, she can call Dr. Shicker if she believes Powers is acting in error (Doc. 142-3, p. 31, 40 148-2, p. 32).   When Shicker sent her an email regarding Plaintiff's care she reviewed the medical records and discharge from the hospital in order to respond to his request (Doc. 142-3, p. 72).   Based on that review, Vinyard believed that the treatment was appropriate (*Id*. at p. 81).

LEGAL STANDARDS

**A. Summary Judgment Standard**

Summary Judgment is proper only "if the admissible evidence considered as a whole shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Dynegy Mktg. & Trade v. Multi Corp.*, **648 F.3d 506, 517 (7th Cir. 2011) (internal quotation marks omitted) (citing FED. R. CIV. P. 56(a)).** *See also Ruffin-Thompkins v. Experian Info. Solutions, Inc.*, **422 F.3d 603, 607 (7th Cir. 2005).** The party seeking summary judgment bears the initial burden of demonstrating—based on the pleadings, affidavits, and/or information obtained via discovery—the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, **477 U.S. 317, 323 (1986).**

After a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)(2)).** A fact is material if it is outcome determinative under applicable law. *Anderson*, **477 U.S. at 248;** *Ballance v. City of Springfield, Ill. Police Dep't*, **424 F.3d 614, 616 (7th Cir. 2005);** *Hottenroth v. Vill. of Slinger*, **388 F.3d 1015, 1027 (7th Cir. 2004).** A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, **477 U.S. at 248.**

On summary judgment, the Court considers the facts in the light most favorable to the non-movant. *Srail v. Vill. of Lisle*, **588 F.3d 940, 948 (7th Cir. 2009).** The Court

adopts reasonable inferences and resolves doubts in the nonmovant's favor. *Id.; Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, **528 F.3d 508, 512 (7th Cir. 2008).**   Even if the facts are not in dispute, summary judgment is inappropriate when the information before the court reveals that "alternate inferences can be drawn from the available evidence."   *Spiegla v. Hull*, **371 F.3d 928, 935 (7th Cir. 2004),** *abrogated on other grounds by Spiegla II*, **481 F.3d at 966 (7th Cir. 2007).**   *See also Anderer v. Jones*, **385 F.3d 1043, 1064 (7th Cir. 2004).**

## B. Deliberate Indifference

Prison officials violate the Eighth Amendment's proscription against "cruel and unusual punishments" if they display deliberate indifference to an inmate's serious medical needs.   *Greeno v. Daley*, **414 F.3d 645, 652–53 (7th Cir. 2005) (quoting** *Estelle v. Gamble*, **429 U.S. 97, 104 (1976) (internal quotation marks omitted)).**   *Accord Rodriguez v. Plymouth Ambulance Serv.*, **577 F.3d 816, 828 (7th Cir. 2009) ("Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution.").**   A prisoner is entitled to reasonable measures to meet a substantial risk of serious harm — not to demand specific care.   *Forbes v. Edgar*, **112 F.3d 262, 267 (7th Cir. 1997).**

To prevail, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test.   *Arnett v. Webster*, **658 F.3d 742, 750 (7th Cir. 2011)(citing** *Johnson v. Snyder*, **444 F.3d 579, 584 (7th Cir. 2006),** *overruled on other grounds Hill v. Tangherlini*, **724 F.3d 965, 967 n. 1 (7th Cir.**

2013)).   The first prong that must be satisfied is whether the prisoner has shown he has an objectively serious medical need.   *Arnett*, 658 F.3d at 750.   *Accord Greeno*, 414 F.3d at 653.   A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated.   *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the *Eighth Amendment* requires "deliberate indifference to a *substantial* risk of *serious* harm." (internal quotation marks omitted) (emphasis added)).   Only if the objective prong is satisfied is it necessary to analyze the second, subjective prong, which focuses on whether a defendant's state of mind was sufficiently culpable.   *Greeno v. Daley*, 414 F.3d 645, 652–53 (7th Cir. 2005).

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health.   *Greeno*, 414 F.3d at 653.   The plaintiff need not show the physician literally ignored his complaint, just that the physician was aware of the serious medical condition and either knowingly or recklessly disregarded it.   *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008).   Courts give deference to physicians' treatment decisions, since "there is not one proper way to practice medicine, but rather a range of acceptable courses." *Jackson v. Kotter*, 541 F.3d 688, 697–98 (7th Cir. 2008).   A doctor who chooses one routine medical procedure over another does not violate the Eighth Amendment. *McGowan v. Hulick*, 612 F.3d 636, 641 (7th Cir. 2010).   *See also Estelle*, 429 U.S. at 107

(whether additional diagnostic techniques or treatments were needed was a "classic example of a matter for medical judgment.").   However, persisting in a course of treatment known to be ineffective states a claim under the Eighth Amendment.   *Greeno v. Daley*, **414 F.3d 645, 655 (7th Cir. 2005) (finding deliberate indifference where medical defendants persisted in a course of conservative treatment for eighteen months despite no improvement).**   Deliberate indifference may also be shown when a medical provider refuses to refer a patient to a specialist for treatment of a painful medical condition that clearly requires a referral.   *See Berry v. Peterman*, **604 F.3d 435, 440 (7th Cir. 2010);** *Hayes*, **546 F.3d at 526.**

ANALYSIS

### A.  Marvin Powers

Powers argues that he is entitled to summary judgment on Plaintiff's claims of deliberate indifference because there is no evidence that his actions in not referring him to an orthopedic specialist or providing him with additional pain medication constituted deliberate indifference.   In making this argument, Defendant relies heavily on *Pyles v. Fahim*, **771 F.3d 403 (7th Cir. 2014)**.   But the Court finds the facts in this case to be distinguishable from that in *Pyles*.

The Court first notes that Powers created issues of fact with his own deposition testimony.   Powers testified that he did not send Plaintiff to an outside referral in order to curb Plaintiff's misbehavior.   While the Court notes that Powers' testimony on the behavior point was confusing and seemed to morph from a simple desire to curb

Plaintiff's behavior to a concern that any treatment of Plaintiff's shoulder would be derailed by Plaintiff's continued misbehavior and fights, the Court must look at that testimony in the light most favorable to Plaintiff. In that light, Powers' testimony indicates that there were other considerations at play, beyond medical judgment, when Powers decided not to refer Plaintiff to an outside specialist. In fact, Powers indicated that there were a number of considerations that could be considered as beyond medical considerations and proper treatment of Plaintiff, including general security concerns and Plaintiff's financial earning capabilities. All of these issues were considered by Powers and may have been dispositive, which could show deliberate indifference if it is shown that Powers' decision not to refer Plaintiff to a specialist was based on one of these concerns and not focused on Plaintiff's proper medical care.

Further, unlike in *Pyles*, Plaintiff has offered an expert witness to support his claim that he should have been referred to a specialist and provided with additional medication to manage his pain. While Dr. Newcomer would not testify about the standard of care in this case and did not want to label Powers' actions as malpractice or gross negligence (for whatever reason), Newcomer did state that Powers failed in his *ethical duty* to properly treat Plaintiff. Newcomer testified that he read Powers' deposition testimony and Powers' other concern and considerations in not referring Plaintiff to specialist fell below Powers' ethical obligation as Plaintiff's doctor. Further, Newcomer testified that Powers did not provide Plaintiff with the proper pain medication as Newcomer would never prescribe Tylenol or Ibuprofen for a dislocated

shoulder, that the injury that Plaintiff suffered would require narcotics. Yet, Powers continued to prescribe him only over the counter pain medication, alternating between Tylenol, Ibuprofen, and Naprosyn. And there is no evidence that Powers increased the dosages of those medications when Plaintiff complained that they were ineffective. Thus, this case is very different from the case in *Pyles* where the inmate was provided various medications with changing dosages in order to control the pain.

Plaintiff has also offered testimony from another inmate to support his claim that Powers' decision not to refer him to a specialist was based on considerations beyond Plaintiff's medical needs. The affidavit of Donnie White indicates that he overheard Powers state that he was not going to give Plaintiff "anything…but a hard time" (Doc. 151-2). White also offered other observations of Powers' behavior towards Plaintiff and his injured shoulder. If the jury believes all of the evidence offered by Plaintiff, the picture presented is that Powers was callous towards Plaintiff's injury and was not looking after Plaintiff's serious medical needs by refusing to provide him with any different pain medications or referring him to a specialist. Looking at the evidence in the light most favorable to Plaintiff, the Court finds enough evidence from which a jury could make a finding of deliberate indifference and thus the Court **DENIES** Defendant Powers' motion for summary judgment.

The Court also notes that Plaintiff has properly presented evidence of harm, namely in evidence that Plaintiff consistently suffered from continued pain during the time that he was at Tamms and under Powers' care. While there is an issue of whether

Plaintiff suffered any long term harm by not being seen by specialist, the Court finds that issue to be one for trial and not dispositive of the issues currently before the Court.

### B. Louis Shicker

As to Plaintiff's claim against Shicker in his individual capacity, there is no evidence of his deliberate indifference.   As an administrative official, Shicker was allowed to rely on the information that he was provided from Nigel Vinyard that acknowledged Plaintiff's injury and pain and stated that he was being treated by Dr. Powers.   There is nothing in that response that would put him on notice that Plaintiff was not being provided with appropriate care nor is there anything that would raise a "red flag" requiring him to make further inquiry.   The evidence before the Court is that Shicker received Plaintiff's complaints and took some inquiry into Plaintiff's concerns. The Court finds no evidence that Shicker acted with deliberate indifference in investigating Plaintiff's complaints about care and thus **GRANTS** Shicker's motion for summary judgment as to his individual capacity claim.

However, Plaintiff's complaint included a claim for injunctive relief which Chief Judge Reagan acknowledged in his threshold order (Doc. 1, p. 3).   That threshold order also indicated that Shicker remained in the case as medical director of IDOC for purposes of instituting any equitable relief awarded "at whichever facility is housing Plaintiff." (Doc. 1, p. 6).   Defendant Shicker did not address the issue of his involvement in the case in his official capacity for the purpose of injunctive relief, and as such, the Court cannot grant summary judgment to Defendant Shicker in his official capacity at

this time.   However, the Court will allow the parties to provide a trial brief on the issue and will discuss how the parties will proceed on this claim at trial.

### C.  Nigel Vinyard

The Court also **DENIES** summary judgment as to Nigel Vinyard.   While a nurse may generally defer to a doctor's treatment, they cannot turn a blind eye to an "inappropriate or questionable practice."   *Berry v. Peterman*, **604 F.3d 435, 443 (7th Cir. 2010);** *Perez v. Fenoglio*, **792 F.3d 768, 669 (7th Cir. 2015).**   When confronted with such practices, a nurse has "a professional obligation" to take action "whether by discussing the nurse's concerns with the treating physician or by contacting a responsible administrator of higher authority."   *Berry*, **604 F.3d at 443.**

Here, Plaintiff has presented evidence that Vinyard was aware of his severe pain and ineffective treatment by Dr. Powers through the various grievances that he wrote to her.   *See Perez*, **792 F.3d at 782 (grievance officials received notice of the medical condition and inadequate care through the "highly detailed grievances and other correspondence.").**   Yet, the evidence presented by Plaintiff indicates that instead of discussing Plaintiff's concerns, she minimized the extent of her contact and Plaintiff's related pain in reports, as well as denied his grievances.   Further, Vinyard had an opportunity to report the inappropriate care to a higher authority when contacted by Powers, but the evidence suggests that she down played Plaintiff's injury and treatment in the email to Shicker.   Plaintiff argues that her email to Shicker was misleading and that it "cherry picked" the medical records to make it look like Plaintiff was being

treated properly.   He argues that she presented an incomplete record to Shicker as she had previously denied Plaintiff's grievances when maybe the grievances requesting additional care should have granted.   While this is just one interpretation of the record, the Court must take the facts presented in the light most favorable to the Plaintiff.   As Vinyard had an opportunity to report to higher authority and, instead, presented an inaccurate picture of Plaintiff's circumstances, as argued by Plaintiff, the Court finds that there are enough facts from which a jury could find that Vinyard was deliberately indifferent.   As such, the Court also finds that Vinyard is not entitled to qualified immunity and **DENIES** Defendant's motion for summary judgment.

### CONCLUSION

Accordingly, the Court **DENIES** Powers' motion for summary judgment and **GRANTS IN PART AND DENIES IN PART** the summary judgment motion filed by Defendants Shicker and Vinyard.   While Shicker is entitled to summary judgment in his individual capacity, he remains in the case in his official capacity for purposes of injunctive relief.   Defendants Powers and Vinyard also remain on Plaintiff's deliberate indifference claims against them.   The case remains set for a final pretrial conference on February 19, 2016.

   **IT IS SO ORDERED**.
   DATED: February 12, 2016.

                                    */s/ Stephen C. Williams*
                                    STEPHEN C. WILLIAMS
                                    United States Magistrate Judge